CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit



In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 09-3927

UBID, INC.,

*Plaintiff-Appellant,*

*v.*

THE GODADDY GROUP, INC., *et al.*,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cv-02123—**Charles P. Kocoras**, *Judge.*

---

ARGUED MAY 19, 2010—DECIDED SEPTEMBER 29, 2010

---

Before FLAUM, MANION, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff uBID, Inc. is a Chicago-based company that auctions the excess inventory of manufacturers and retailers over the Internet. It brought suit in Illinois against The GoDaddy Group, Inc., which operates the well-known domain name registration site GoDaddy.com. In its complaint, uBID alleged that GoDaddy violated the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), by inten-

tionally registering domain names that are confusingly similar to uBID's trademarks and domain names for the purpose of profiting from uBID's marks and exploiting web surfers' confusion by selling advertising for those confusingly similar websites. The district court dismissed the case for lack of personal jurisdiction, holding that GoDaddy, which is headquartered in Arizona, lacked sufficient contacts with Illinois to be sued there. See *uBID, Inc. v. GoDaddy Group, Inc.*, 673 F. Supp. 2d 621 (N.D. Ill. 2009). We reverse. We conclude that due process is not violated when a defendant is called to account for the alleged consequences of its deliberate exploitation of the market in the forum state.

### Factual and Procedural Background

At this early stage in the litigation, and without the benefit of an evidentiary hearing, the plaintiff bears only the burden of making a prima facie case for personal jurisdiction. We take the plaintiff's asserted facts as true and resolve any factual disputes in its favor. See *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010); *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Our review of the district court's legal analysis is de novo. *State of Illinois v. Hemi Group LLC*, ___ F.3d ___, ___, 2010 WL 3547647, at *2 (7th Cir. Sept. 14, 2010).

GoDaddy, which has offered registration services since 2000, has tried to restrict its physical presence to Arizona. Its computer servers, which handle most of the

No. 09-3927                                      3

work of registering and maintaining the domains that GoDaddy's customers buy, are all located in Arizona. GoDaddy is incorporated and headquartered in Arizona, and the vast majority of its offices and employees are located in Arizona.

While GoDaddy has taken pains to limit its physical presence to Arizona, its virtual presence in the rest of the country cannot be ignored. GoDaddy has imprinted itself on the national consumer consciousness with a series of television advertisements featuring the "GoDaddy Girls"—celebrities who invite viewers to register a domain name at a low price. In recent years these ads have aired throughout the country with great frequency, including during the last six Super Bowl broadcasts. The company's advertising extends well beyond television. Potential customers who might step away from the television during GoDaddy's ads can still see the company's logo stamped on driver Danica Patrick's race car and golfer Anna Rawson's hat. In Illinois, GoDaddy has put up billboards in the home ballparks of the Chicago Cubs and White Sox, and fans who attend Chicago Bulls or Blackhawks games or races at the Chicagoland Speedway have been treated to GoDaddy ads as well.

This nationwide advertising campaign has paid dividends for GoDaddy from the Illinois market. In 2008, the company counted its Illinois customers in the hundreds of thousands, and those customers delivered many millions of dollars in revenue to GoDaddy that year. (GoDaddy asked that the exact numbers be kept confidential. The orders of magnitude are sufficient for our

purposes.) There is no evidence that GoDaddy's business in Illinois has fallen off since then.

GoDaddy's customers, including those in Illinois, buy a variety of services. Some buy domain names and build websites under those domain names. Others buy domain names and do nothing with them, but allow GoDaddy and its partner, Google, to place ads on the websites (known as "parked pages") and to collect fees when visitors click on the ads. Still others buy domain names and pay GoDaddy a further fee, which allows the buyers themselves to take a share of the ad revenues from their parked pages (known as "cash parking").

According to uBID's complaint, some of GoDaddy's customers engage in a form of cybersquatting. They allegedly buy and park their domain names not to build websites there in the future, but rather to profit merely by owning them. These GoDaddy customers register domain names that are confusingly similar to existing domain names, and they hope either to sell the similar domain to the original site's owner for a premium or to generate fees from wayward web surfers who click on a link to their site and then click on ads, leading the advertisers to pay GoDaddy, Google, and the GoDaddy customer. According to uBID's allegations, GoDaddy also wants confused consumers to click on its customers' parked pages, instead of uBID's website, because more clicks on the confusingly-named parked pages mean more revenue for GoDaddy, too. Complaint ¶¶ 2, 20-25.

In its complaint, uBID alleges that this practice has harmed the value of its trademarks, which include

UBID and UBID.COM. The complaint points to dozens of domain names registered with GoDaddy that may be confusingly similar to its marks, such as ubid4homes.com, ubidr.com, and ubidauctionsale.com. Regarding the merits of its claim under the federal anti-cybersquatting law, GoDaddy intends in bad faith, uBID alleges, to profit from the confusion of people who visit such sites. Complaint ¶¶ 20-25. Although most of the customers who registered offending sites on uBID's list appear to be located outside of Illinois, two gave Illinois addresses.

GoDaddy responded to uBID's suit with a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. The district court granted GoDaddy's motion. The court rejected uBID's argument that GoDaddy was subject to both general and specific personal jurisdiction in Illinois. Defining GoDaddy's contacts with Illinois to include only the two Illinois-registered domain names listed in uBID's complaint, the court held that those contacts were "created at the initiative of Illinois residents" and could not be attributed to GoDaddy. Moreover, the court held, because GoDaddy enters into thousands of contracts with thousands of customers across the country, GoDaddy "should not reasonably expect" to be subject to personal jurisdiction in each of those customers' states.

## *Analysis*

In this federal question case where federal statutes do not authorize nationwide service of process, a

federal court in Illinois may exercise personal jurisdiction over GoDaddy if it would be permitted to do so under the Illinois long-arm statute. See Fed. R. Civ. P. 4(k)(1)(A). A state's exercise of personal jurisdiction is also subject to the demands of the Fourteenth Amendment's due process clause. Because Illinois permits personal jurisdiction if it would be authorized by either the Illinois Constitution or the United States Constitution, the state statutory and federal constitutional requirements merge. See *State of Illinois v. Hemi Group LLC*, ___ F.3d at ___, 2010 WL 3547647, at *2; *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010), citing 735 Ill. Comp. Stat. 5/2-209(c).

Personal jurisdiction can be either general or specific, depending on the extent of the defendant's contacts with the forum state. If the defendant's contacts are so extensive that it is subject to general personal jurisdiction, then it can be sued in the forum state for any cause of action arising in any place. More limited contacts may subject the defendant only to specific personal jurisdiction, in which case the plaintiff must show that its claims against the defendant arise out of the defendant's constitutionally sufficient contacts with the state. In either case, the ultimate constitutional standard is whether the defendant had "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940). In uBID's estimation, GoDaddy should be subject to either general or specific jurisdiction in Illinois. We conclude that GoDaddy is not subject to

general jurisdiction in Illinois, but it is subject to specific
jurisdiction in this suit.


I. *General Jurisdiction*

A defendant is subject to general jurisdiction when it
has "continuous and systematic general business con-
tacts" with the forum state. See *Helicopteros Nacionales
de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). This
is a demanding standard that requires the defendant
to have such extensive contacts with the state that it can
be treated as present in the state for essentially all pur-
poses. See *Tamburo*, 601 F.3d at 701; *Purdue Research*, 338
F.3d at 787. The standard for general jurisdiction is de-
manding because the consequences can be severe: if a
defendant is subject to general jurisdiction in a state,
then it may be called into court there to answer for any
alleged wrong, committed in any place, no matter how
unrelated to the defendant's contacts with the forum.
See *id.*

GoDaddy's contacts with Illinois do not satisfy this
standard. Although its contacts are extensive and deliber-
ate, they are limited to the marketing and sale of registra-
tions for Internet domain names, as well as contracts
with many Illinois customers and the hosting of websites
accessible from Illinois. It would be unfair to require
GoDaddy to answer in Illinois for any conceivable
claim that any conceivable plaintiff might have against
it. See *Tamburo*, 601 F.3d at 701 (maintenance of public
website is not sufficient, without more, to establish
general jurisdiction). Imagine an Illinois visitor to

GoDaddy's headquarters in Arizona who slipped, fell, and then sued for the injury, or a GoDaddy employee who worked in Arizona, was fired, moved to Illinois, and then sued for wrongful termination. There is no reason for GoDaddy to expect, as it goes about its business of selling domain names in Illinois, that it is thereby exposing itself to such lawsuits in Illinois. The district court correctly found that GoDaddy is not subject to general jurisdiction in Illinois.

## II.  *Specific Jurisdiction*

   Though insufficient to support personal jurisdiction for all claims, a defendant's contacts with a state will often support jurisdiction for a claim that is sufficiently related to the defendant's activities in the state. The ultimate constitutional standard for the exercise of specific jurisdiction has been the same since the Supreme Court first abandoned strict territorial jurisdiction: is it fair and reasonable to call the defendant into the state's courts to answer the plaintiff's claim? See *International Shoe*, 326 U.S. at 317 (the demands of due process "may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there"); accord, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The due process clause will not permit jurisdiction to be based on contacts with the forum that are random, fortuitous, or attenuated. *Burger King*, 471 U.S. at 475.

No. 09-3927                                                    9

   In applying this broad standard, the Supreme Court
has found that the contacts supporting specific jurisdic-
tion can take many different forms. See, *e.g.*, *International
Shoe*, 326 U.S. at 314-15 (defendant employed salesmen
or agents in the forum state and shipped physical mer-
chandise to forum state buyers); *Burger King*, 471 U.S. at
474-75 (defendant did not physically enter the forum
but "purposefully avail[ed]" itself of the benefit and
protection of the forum state's laws by entering into long-
term business franchise contract with resident of forum);
*Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (individual
defendants committed an intentional tort outside the
forum state but expressly aimed their misconduct at the
forum state).

### A.  *Defendant's Contacts with Illinois*

   Because of GoDaddy's extensive marketing in Illinois
and sales to Illinois customers, including two who alleg-
edly cyber-squatted on domain names similar to uBID's,
the Supreme Court's analysis of specific jurisdiction
in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), is
most instructive here. In that case, a New York resident
filed a libel suit in New Hampshire against Hustler Maga-
zine, a resident of Ohio and California. The magazine
had no employees or offices in New Hampshire and
did not expressly aim its publication or conduct at New
Hampshire in particular. There was no evidence of any
marketing targeted specifically at New Hampshire resi-
dents, and the magazine's sales in New Hampshire made
up only a tiny part of its total sales. Yet the Supreme
Court found that the magazine could be called to New

Hampshire to answer the libel suit because it circulated 10,000 to 15,000 copies of its magazine to subscribers in New Hampshire each month. See *id.* at 773-74.

As in every personal jurisdiction case since *International Shoe*, the outcome in *Keeton* turned on whether the relationship between the plaintiff's claim and the defendant's contacts with the state made it fair to call the defendant into court there. The Supreme Court found that the magazine had "continuously and deliberately exploited the New Hampshire market" by regularly circulating its magazine to New Hampshire residents. *Id.* at 781. The plaintiff's claim for libel arose "out of the very activity" the magazine was conducting in the state, a close enough relationship that it was reasonable to expect the magazine to answer the plaintiff's suit in that state. *Id.* at 779-80. Because the magazine produced "a national publication aimed at a nationwide audience," there was "no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed." *Id.* at 781.

The same reasoning applies here. GoDaddy has thoroughly, deliberately, and successfully exploited the Illinois market. Its attempt to portray itself either as a local Arizona outfit or as a mindless collection of servers is unconvincing. This is a company that, like the national magazine in *Keeton*, has conducted extensive national advertising and made significant national sales. GoDaddy has aired many television advertisements on national networks, including six straight years of Super Bowl ads. It has engaged in extensive venue advertising and

Case: 09-3927   Document: 07111338375   Filed: 08/29/2020   Pages: 31

celebrity and sports sponsorships. All of this marketing has successfully reached Illinois consumers, who have flocked to GoDaddy by the hundreds of thousands and have sent many millions of dollars to the company each year. These contacts establish GoDaddy's minimum contacts with the state for claims sufficiently related to those contacts.[1]

GoDaddy seeks to distance itself from Illinois by casting the Illinois market as simply one among many, a place of no particular interest to it. Although its ads can be seen on Illinois television sets and computer screens

---

[1] Because GoDaddy's actual contacts with Illinois meet the constitutional standard for minimum contacts under *Keeton*, we need not decide whether sufficient contacts should be imputed under the *Calder* "express aiming" test announced by the Supreme Court on the same day as *Keeton*. Our concurring colleague finds that *Calder* provides the more useful guidance here, but it may be that our colleague's proposed analysis under *Calder* would produce an even more expansive test for personal jurisdiction in cases alleging intentional torts. *Calder* can be read as authorizing personal jurisdiction in the home state of the victim of almost any alleged intentional tort, but it need not and should not be read quite so broadly. As we explained in *Tamburo*, two cases in this circuit—*Wallace v. Herron*, 778 F.2d 391, 394-95 (7th Cir. 1985), and *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202-03 (7th Cir. 1997)—are in some tension with respect to the scope of the "express aiming" test from *Calder*. See *Tamburo*, 601 F.3d at 704-06 & n.8. *Tamburo*, *Wallace*, and *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Ltd. P'ship*, 34 F.3d 410, 411-12 (7th Cir. 1994), are consistent in requiring "something more" beyond injury in the forum state from an alleged intentional tort.

and at Illinois sports venues, GoDaddy contends that
these are only parts of a national advertising campaign
and that it does not target its advertising toward Illinois
residents in particular. Likewise, GoDaddy argues that
its sales in Illinois are merely "the unilateral activity of
Illinois residents" entered into "at the initiative of the
customers," and processed automatically by GoDaddy's
servers in Arizona. These characterizations of GoDaddy's
contacts with Illinois are inaccurate.

It is true that there is no evidence that GoDaddy specifi-
cally targets Illinois customers in its advertising. The
same could have been said of the defendant in *Keeton v.
Hustler Magazine*, and those arguments did not prevail.
Instead, what mattered was that the magazine had pur-
posefully directed its business activities toward New
Hampshire just as it had toward all other states. See 465
U.S. at 774 (describing district court's findings). Consistent
with the reasoning of *Keeton*, it is easy to infer that
GoDaddy's national marketing campaign is intended
to reach as large an audience as possible, including the
13 million potential customers in the nation's fifth
most populous state. In fact, we need not infer: there is
evidence in this case that GoDaddy (or its agent) has
placed physical ads in particular Illinois venues. The
evidence shows that this marketing campaign has
already created substantial business for GoDaddy in
Illinois. There was no such evidence in the cases GoDaddy
cites. See, *e.g.*, *Singletary v. B.R.X., Inc.*, 828 F.2d 1135, 1136-
37 (5th Cir. 1987) (no evidence of the frequency of ad-
vertising or the amount of business defendant gained in
the state; only one unrelated sale in the forum state), cited
in *Web.com, Inc. v. The GoDaddy Group, Inc.*, No. 1:06-cv-

No. 09-3927                                    13

1461 (N.D. Ga. Aug. 3, 2007); *Hy Cite Corp. v. Badbusinessbureau.com, LLC*, 297 F. Supp. 2d 1154, 1164 (W.D. Wis. 2004) (defendant did not advertise for its site within forum state and plaintiff did not show what benefit defendant took from advertising in that state); *High Maintenance Bitch, LLC v. Uptown Dog Club, Inc.*, 2007 WL 3046265, at *3 (W.D. Wash. Oct. 17, 2007) (single sale in forum state).

No more persuasive is GoDaddy's argument that its sales to Illinois residents are automated transactions unilaterally initiated by those residents. GoDaddy tells us that its customers enter into most transactions without any human action on GoDaddy's end. But of course the customers who buy domain names from GoDaddy are not simply typing their credit card numbers into a web form and hoping they get something in return. GoDaddy itself set the system up this way. It cannot now point to its hundreds of thousands of customers in Illinois and tell us, "It was all their idea." See *State of Illinois v. Hemi Group*, ___ F.3d at ___, 2010 WL 3547647, at *4 (misleading to describe internet sales as "unilateral" on part of customers where seller took significant steps both before and after sales). GoDaddy is aware that it earns many millions of dollars annually from Illinois customers, and it cannot be unhappy to have had such success in the state. Its contacts cannot fairly be described as random, fortuitous, or attenuated.[2]

---

[2] All contracts between GoDaddy and its customers include a standard forum-selection clause requiring disputes between

(continued...)

Nor should GoDaddy's unusual business model complicate an otherwise straightforward case for sufficient minimum contacts. As *Keeton v. Hustler* shows, a typical business that operates on a national scale with GoDaddy's sales in Illinois, GoDaddy's customer base in Illinois, and GoDaddy's blanket of advertising in Illinois would unquestionably be subject to personal jurisdiction there for claims arising from its business activities that reach into the state. It would be reasonable for such a company to expect to be sued there. GoDaddy's way of doing business allows it to avoid the type of physical presence that makes these questions easier when dealing with non-Internet companies that operate on a similar scale. But the fact that GoDaddy can make millions of dollars and recruit hundreds of thousands of customers without the equivalent of International Shoe's sales representatives, Ford's dealerships, or Coca-Cola's distributors is not decisive under the flexible jurisdictional analysis that the Supreme Court has applied consistently. What matters is that GoDaddy purposefully availed itself of the Illinois market for

---

[2] (...continued)

GoDaddy and the customer to be litigated in Arizona. The forum-selection clauses are not relevant to this case. They may be a reasonable way for GoDaddy to protect itself from being called into court by a customer in the customer's home state. GoDaddy's alleged misconduct toward a third party, however, has nothing to do with the jurisdictional expectations the company has fostered with those customers who read all the details of the form contract.

No. 09-3927                                                    15

its services through its deliberate and continuous ex-
ploitation of that market.

####   B.   *The Relationship Between Defendant's Contacts and Plaintiff's Claim*

Mere minimum contacts, however, are not sufficient
to establish specific personal jurisdiction. As the Supreme
Court has emphasized, it is essential not only that the
defendant have minimum contacts with the forum state
but also that the plaintiff's claim against the defendant
"arise out of or relate to" those contacts. *Burger King*, 471
U.S. at 472-73, quoting *Helicopteros Nacionales*, 466 U.S. at
414; *Tamburo*, 601 F.3d at 708. GoDaddy argues that all
of its contacts with Illinois are irrelevant to the constitu-
tional analysis because they are unrelated to uBID's
lawsuit. This argument fails because it misunderstands
the reason why due process requires that the claim and
the contacts be related.

On this relationship, our opinion in *RAR, Inc. v. Turner
Diesel, Ltd.*, 107 F.3d 1272 (7th Cir. 1997), is instructive.
"We cannot simply aggregate all of a defendant's con-
tacts with a state—no matter how dissimilar in terms
of geography, time, or substance—as evidence of the
constitutionally-required minimum contacts." 107 F.3d
at 1277. To do so would mean that people and companies
would have to conduct interstate business without the
confidence that "transactions in one context will not
come back to haunt them unexpectedly in another." *Id.*
at 1278. That kind of uncertainty surrounding the conse-

quences of one's actions in another state is precisely what the due process clause aims to prevent in the context of specific jurisdiction. *Id.* at 1277-78; accord, *International Shoe*, 326 U.S. at 317 (subjecting a corporate defendant to suit on claims with no connection to its activities in the forum state "has been thought to lay too great and unreasonable a burden on the corporation to comport with due process").

Can we say more precisely how the plaintiff's claim and the defendant's contacts must be related? Illustrating competing approaches to this question, some circuits have analogized the required relationship between contacts and claims to the tort concepts of but-for and proximate causation. See *Tamburo*, 601 F.3d at 708-09, comparing *Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 35 (1st Cir. 1998) (requiring for a tort claim that the defendant's contacts be the proximate or legal cause of the plaintiff's injury); with *Doe v. American Nat'l Red Cross*, 112 F.3d 1048, 1051 n.7 (9th Cir. 1997) (requiring only that the defendant's contacts be the but-for cause of the plaintiff's injury); *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 n.21 (5th Cir. 1981) (same). We have not previously endorsed either approach, see *Tamburo*, 601 F.3d at 709, and we decline to do so now.

The Third Circuit's opinion in *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312 (3d Cir. 2007), shows why neither of those conceptions of relatedness is entirely satisfactory. In *O'Connor*, the plaintiffs were a Pennsylvania couple who had been heavily solicited in Pennsylvania by a resort in Barbados and contracted with the resort

for a spa vacation there. One of the plaintiffs suffered an injury during their stay, and they sued the resort for negligence in Pennsylvania. The Third Circuit held that the resort was subject to personal jurisdiction in Pennsylvania. The court followed the Supreme Court's lead in declining to apply a mechanical test, but tried to provide structured guidance for district courts and litigants. The Third Circuit focused on the "tacit quid pro quo that makes litigation in the forum reasonably foreseeable:" out-of-state residents may avail themselves of the benefits and protections of doing business in a forum state, but they do so in exchange for submitting to jurisdiction in that state for claims arising from or relating to those activities. See *id.* at 322, citing *Burger King*, 471 U.S. at 475-76.

On this understanding of relatedness, neither but-for causation nor proximate causation is a satisfactory guide. But-for causation would be "vastly overinclusive," haling defendants into court in the forum state even if they gained nothing from those contacts. The tacit quid pro quo would break down. See *O'Connor*, 496 F.3d at 322-23. On the other hand, requiring proximate causation between contacts and claim would exclude too many claims like the one in *O'Connor*, where the defendant's contacts with Pennsylvania proved little about the plaintiff's negligence claim, but undoubtedly gave the defendant fair warning that the very business it sought in Pennsylvania might injure a Pennsylvania resident. See *id.* at 323-24. The precise causal relationship between contacts and claim was not important; what was required was that the relationship be "intimate enough

to keep the quid pro quo proportional and personal
jurisdiction reasonably foreseeable." *Id.* at 323. The
Third Circuit's approach follows carefully the Supreme
Court's guidance on the question of relatedness. See
*International Shoe*, 326 U.S. at 319 (identifying exchange
of protection of laws of forum state for obligation to
respond there, and authorizing jurisdiction where the
obligations to respond "arise out of or are connected with
the activities within the state"); *Burger King*, 471 U.S. at
475-76. It is also consistent with our own precedent on
this subject. See *RAR*, 107 F.3d at 1278 (rejecting "but-for"
causation in contract case, and recognizing that the
"line will not always be a bright one").

   The relationship between GoDaddy's Illinois contacts
and uBID's claims is close enough to make the related-
ness quid pro quo balanced and reasonable. GoDaddy
has reached hundreds of thousands of people in Illinois
with its advertising, which we know because it has made
hundreds of thousands of sales in Illinois. How has
GoDaddy advertised and made these sales? Based on
the allegations in uBID's complaint, it has done so "by
offering 'free parking' of a registrant's domain name."
Complaint ¶ 20. Looking to the forum state's side of the
bargain, what does the plaintiff charge GoDaddy with
doing? The greatest part of uBID's complaint is devoted
to allegations that, as the licensee of its registrants,
GoDaddy "used and trafficked in" the free parked pages
with bad-faith intent to profit from uBID's marks. Com-
plaint ¶¶ 20-22; Ex. A. Substantively, the contacts alleged
in uBID's complaint and the wrongs alleged in uBID's
complaint are so intimately related that GoDaddy

No. 09-3927                                                    19

cannot reasonably have been surprised to find itself sued in Illinois. Temporally, too, the claim and the contacts are inseparable. The allegedly infringing parked pages were all active and garnering income at the time uBID filed its complaint, see Compl. Ex. A, during which time GoDaddy was also advertising and selling domain names in Illinois through its parked page service. *Cf. GCIU-Employer Retirement Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1024-25 (7th Cir. 2009) (affirming dismissal for lack of personal jurisdiction where defendant surrendered its controlling interest in a subsidiary in the forum months before the sale of the subsidiary gave rise to the lawsuit).

The concept of a geographical nexus is harder to apply to cases like this one, where the alleged wrong can fairly be characterized as occurring anywhere the Internet is accessible. In other words, uBID has the same claim against GoDaddy whether the customer who registered <ubidd.com> or another similar domain name did so from Illinois, from Wyoming, or from China. One conclusion we might draw from this fact is that a physical geographical nexus is simply less important in cases where the alleged harm occurred over the Internet. Such a conclusion would not necessarily be inconsistent with due process. After all, the geographical relationship between claim and contacts is only one facet of the constitutional inquiry. The plaintiff must still prove that the defendant had constitutionally sufficient contacts with the forum and that the defendant's contacts were temporally and substantively related to the lawsuit. Without that showing, the mere fact that the defendant allegedly

No. 09-3927

caused harm by conducting business or advertising over
the Internet is not adequate to establish jurisdiction in
the plaintiff's chosen forum state. See, *e.g.*, *GTE New
Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1350
(D.C. Cir. 2000); *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414,
418 (9th Cir. 1997).[3]

GoDaddy argues that the alleged injury to uBID was
not complete until GoDaddy connected the newly regis-
tered domain name to the parked page service. By this
logic, the location of GoDaddy's alleged misconduct was
Arizona, no matter where the GoDaddy customer lived,
and uBID's claim arising out of that misconduct is unre-
lated to any of GoDaddy's contacts with Illinois.

---

[3] This is true even if the website is highly interactive. The
parties urge us either to adopt or to reject the test for minimum
contacts based on website interactivity proposed in *Zippo
Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D.
Pa. 1997). We decline to adopt either view. When a plaintiff
alleges that some of the defendant's contacts occurred
through a website, the interactivity of that website is relevant
to, but not dispositive of, the sufficiency of those contacts.
Using a separate test for Internet-based contacts would be
inappropriate when the traditional analysis of the "nature,
quality, and quantity of the contacts, as well as their relation to
the forum state," remains up to this more modern task. *Consult-
ing Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 279 n.5 (4th
Cir. 2009); accord, *State of Illinois v. Hemi Group*, ___ F.3d at ___,
2010 WL 3547647, at *4 (stating that "the traditional due process
inquiry . . . is not so difficult to apply to cases involving
Internet contacts that courts need some sort of easier-to-apply
categorical test"); *Tamburo*, 601 F.3d at 703 n.7 (declining
to endorse special jurisdictional test for internet cases).

No. 09-3927                                                    21

Due process does not require us to slice GoDaddy's
alleged wrongdoing so finely. When customers go to
GoDaddy.com and register for GoDaddy's parked page
or cash parking services, they pay a fee with the expecta-
tion that they will get what they've paid for. At that
point, GoDaddy is contractually obligated to commit the
wrong alleged by uBID. Where GoDaddy chooses to
locate the servers that complete the task is irrelevant. The
claim brought by uBID in Illinois arises directly out
of GoDaddy's registration of the infringing domain
names bought by customers it has solicited in Illinois and
many other states. The claim bears a sufficient relation-
ship to GoDaddy's business activities in Illinois to
expect GoDaddy to defend itself in Illinois without vio-
lating the due process clause.


C.  *A Final Look at Fairness*

Before concluding the analysis, we must still satisfy
ourselves that the exercise of specific jurisdiction over
GoDaddy in Illinois would not offend traditional notions
of "fair play and substantial justice." *Burger King*, 471 U.S.
at 476, quoting *International Shoe*, 326 U.S. at 320. The
concerns that the Supreme Court has identified for this
final inquiry are the burden on the defendant, the
forum state's interest in adjudicating the dispute, the
plaintiff's interest in obtaining convenient and effective
relief, the interstate judicial system's interest in efficiently
resolving controversies, and the shared interest of the
states in furthering fundamental substantive social
policies. See *id.*

Some of these concerns counsel in favor of allowing Illinois to exercise personal jurisdiction in this case; none point the other way. The burden of defending a lawsuit in Illinois is minimal for GoDaddy, a corporation with a broad enough reach to operate and market its services on a national scale. Though uBID is also a successful, sophisticated corporation, a finding that GoDaddy is not subject to personal jurisdiction in a forum it has so thoroughly exploited would create significant barriers to effective relief for similarly situated plaintiffs with more limited resources. We must also be mindful of Illinois's significant interest in providing a forum for its residents to seek relief when they suffer harm in Illinois from a wrong that occurred at least in part in Illinois. Along those lines, we do not view the presence of uBID's headquarters in Illinois as necessary to establish personal jurisdiction here, but we can agree with our concurring colleague at least to the extent that uBID's presence does not weaken an already-sufficient case for personal jurisdiction but actually strengthens the case for the fairness of jurisdiction in Illinois.

We share our concurring colleague's concern about adopting an overly expansive test of jurisdiction for internet-based commerce. See also *State of Illinois v. Hemi Group*, ___ F.3d at ___, 2010 WL 3547647, at *6; *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 549-50 (7th Cir. 2004). GoDaddy's contacts with Illinois are extensive. It has hundreds of thousands of customers in the state and earns millions of dollars in revenue from the state each year. Illinois residents encounter GoDaddy's ads on television, on the Internet, and on billboards at

No. 09-3927                                          23

Wrigley Field and the United Center, among many others.
GoDaddy has continuously and deliberately exploited the
Illinois market for domain name registration and has
profited handsomely from it. Now GoDaddy is being
called to account for alleged harm to an Illinois resident
arising directly from the services GoDaddy provides to
its Illinois customers, at least two of whom registered
domain names that contributed to the alleged harm.
There is no unfairness in requiring GoDaddy to defend
that lawsuit in the courts of the state where, through the
very activity giving rise to the suit, it continues to gain so
much. See *State of Illinois v. Hemi Group*, ___ F.3d at ___,
2010 WL 3547647, at *6 (finding that jurisdiction in
Illinois was fair where defendant had set up "expansive,
sophisticated commercial venture online," held itself
out to conduct business nationwide, and succeeded in
reaching customers across the country).

  We recognize that our analysis here does not provide
crisp, bright lines for district courts and litigants, but
this is a field of law where the Supreme Court has repeat-
edly refused opportunities to draw such bright lines. See,
*e.g.*, *Burger King*, 471 U.S. at 486 & n.29 (standard of
"'fair play and substantial justice' necessarily requires
determinations 'in which few answers will be written "in
black and white. The greys are dominant and even
among them the shades are innumerable."'"), quoting
*Kulko v. California Superior Court*, 436 U.S. 84, 92 (1978). In
this case, the "relationship among the defendant, the
forum, and the litigation," see *Shaffer v. Heitner*, 433 U.S.
186, 204 (1977), is close enough not to offend due process.

Accordingly, we REVERSE the district court's judgment dismissing the suit for lack of personal jurisdiction and REMAND for further proceedings.

MANION, *Circuit Judge*, concurring.  I agree with the court that personal jurisdiction in Illinois is proper. I write separately because under the facts of this case, I would apply a more limited formula for connecting GoDaddy's contacts in Illinois with uBID's claim. In my view, personal jurisdiction in Illinois is proper for the simple reason that uBID is headquartered in Illinois, and that is where GoDaddy has directed, and uBID will be affected by, the harm at issue.

This is a difficult case, in a difficult area of the law. Our case law centers on ambiguous tests and turns on varying facts that prevent courts and practitioners from discerning bright lines. Looking at the same set of cases with the same set of facts, reasonable minds can disagree about whether and how a certain combination of facts suffices to establish personal jurisdiction. This is such a case.

There are three contacts that tie GoDaddy to Illinois: one, its advertising at sporting events in Illinois; two, its website service contracts with hundreds of thousands of

Illinois residents; and three, the advertising it places on "parked pages" with domain names that infringe on uBID's trademark. Following *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), the court emphasizes the importance of the first two contacts and finds that the plaintiff's claim arises out of them. Under the court's analysis, the contacts and the claim under the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("Act"), are close enough to make "the relatedness quid pro quo balanced and reasonable." Op at 18. Thus, it is fair that GoDaddy should be held accountable in Illinois.

The court's formula for connecting GoDaddy's contacts in Illinois with uBID's claim is, in my view, unnecessarily broad. uBID's claim is not that GoDaddy's conduct violates the Act when it merely registers an infringing domain name. In fact, such a claim would not be actionable under the Act, which limits liability to damages "for the registration or maintenance of a domain name" where there is "*a showing of bad faith intent to profit* from such registration or maintenance of the domain name." *Id.* § 1114(D)(iii) (emphasis added). Rather, uBID claims that GoDaddy is acting as a cybersquatter or typosquatter, depending on what derivative of uBID's domain name is used. In this capacity it takes these infringing domain names, puts up a parked page, and on the parked pages places links and advertisements to other websites—advertisements that GoDaddy exclusively controls. Most of these links and advertisements are for uBID's competitors. For example, when someone mistakenly searches for uBID by typing

"youbid," he is directed to a parked page covered with advertisements for uBID's competitors. When the person clicks on one of the advertisements, GoDaddy generates revenue for itself.

According to uBID, GoDaddy engages in a heightened form of cybersquatting, by trafficking these infringing domain names and placing advertising on them to generate revenue for itself. In this way, GoDaddy has monetized the infringing domain names and violated the Act. Complaint ¶ 32. According to uBID, GoDaddy's behavior has taken three forms: one, it has trafficked in these deceptive domain names, even when it knew they were identical or confusingly similar to uBID's protected and valuable marks; two, it has offered to sell or otherwise assign the deceptive domains for financial gain; and three, it has trafficked in and used these deceptive domain names to divert customers from uBID's website. *Id.* ¶¶ 41-43. In sum, GoDaddy is engaged in cybersquatting. Of course, GoDaddy denies all of this.

The problem with cybersquatting websites is well-documented. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 25:77 (4th ed. 2010). These websites and domain names do not exist for a legitimate purpose. Instead, the owners wait for a company like uBID to buy the infringing domain name, and in the meantime GoDaddy as their licensee helps siphon customers away from uBID by drawing the typo-prone to uBID's competitors. Understood in this way, the claim uBID has against GoDaddy does not relate to GoDaddy's contracts with hundreds of thousands of Illinois resi-

Case: 09-3927  Document: 0711383756  Filed: 08/29/2010  Pages: 31

dents, nor does it arise out of its advertising at sporting events. Instead, the claim centers on how GoDaddy's actions with these infringing domain names constitutes cybersquatting.

By viewing the claim this way, the *Keeton* analysis does not govern. Rather, the analysis from *Calder v. Jones*, 465 U.S. 783, 789-90 (1984), for intentional harms directed at other states should be used. Although the distinction may be slight, the result is significant. Using the *Keeton* formula subjects GoDaddy to personal jurisdiction for uBID's claim in any state that GoDaddy advertises and has customers—including at least one customer who registers an infringing domain name. That could be every state in the Union. While Hustler Magazine expressed similar shock at being haled into a New Hampshire court, a few billboards and clients in a state and web advertisements are not the same as 15,000 copies of a libelous magazine in the hands of people located there.

Using the analysis from *Calder* fits with the harm GoDaddy alleges and accords with the way we and other circuits have analyzed personal jurisdiction in these sorts of cases involving the internet.[1] *Calder* has three

---

[1] *E.g., Tamburo v. Dworkin*, 601 F.3d 693, 703 (7th Cir. 2010); *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156 (9th Cir. 2006); *Revell v. Lidov*, 317 F.3d 467, 472-73 (5th Cir. 2002); *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707 (4th Cir. 2002); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1068 (10th Cir. 2008); *Licciardello v. Lovelady*, 544 F.3d 1280, 1288

(continued...)

requirements for personal jurisdiction: (1) intentional
conduct; (2) expressly aimed at the forum state; (3) with
the defendant's knowledge that the plaintiff would
be injured in the forum state. *Tamburo*, 601 F.3d at 703.
GoDaddy's alleged bad faith covers all three. First,
GoDaddy's conduct is intentional. Normally, a trade-
mark violation does not have to be intentional. McCarthy,
*supra* § 32.38. But in this case it does: to have a claim
under the Act, uBID must show that GoDaddy acted
with a bad-faith intent to profit from the registration or
maintenance of the domain name. 15 U.S.C. § 1114(D)(iii).
In this context, "bad faith" can be established in many
ways. *Id.* § 1125(d)(1)(B)(i) (providing a non-exhaustive
list of nine factors for courts to consider); *see also*
McCarthy, *supra* § 25.78 (discussing each). Two of the
four factors that indicate "bad faith" involve knowledge
of the rightful owner and knowledge that the actions
will harm the owner's mark or business. *Id.* (specifically
factors 5 and 6). And uBID's allegations of intentional
conduct closely track the language of the statute.

Second, this intentional conduct is aimed at Illinois.
uBID's claim is that GoDaddy is engaged in cyber-
squatting and typosquatting. Both activities are done
around and in reference to a legitimate and valuable
domain name. Cybersquatters register these domain
names to force "the rightful owners of the marks to pay

---

1  (...continued)
(11th Cir. 2008); *see also* Teresa J. Cassidy, *Civil Procedure—Effects
of the "Effects Test,"* 9 Wyo. L. Rev. 575, 591-92 (2009).

for the right to engage in electronic commerce under their own brand name." *Virtual Works, Inc. v. Volkswagen of America*, 238 F.3d 264, 267 (4th Cir. 2001) (quotation omitted). Cybersquatting is nothing more than a scheme to defraud businesses. It is not carried out aimlessly or indiscriminately but targeted against the rightful owner in hopes they will pay for the infringing website, rather than incur the costs of going through the courts. *Id.*; *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 778 (8th Cir. 2004). The complaint alleges that GoDaddy diverts customers to uBID's competitors and diminishes the value of uBID's domain name, until uBID buys the infringing domain name or attains it through legal action. *E.g.*, *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214 (4th Cir. 2002) (an example of such an action). In this way, the conduct is aimed at uBID's headquarters, in Illinois, where it will be harmed because of lost revenue. *See Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998).

Third, uBID's claim is that GoDaddy engaged in cybersquatting. If this is proven, these would not be random, fortuitous, or attenuated acts: rather, these are intentional, deliberate, and targeted acts against uBID. GoDaddy knew the harm was directed at Illinois: it knew that uBID, domiciled in Illinois, owned the UBID.com domain name, and it knew that these pages infringed on that name. What is more, it trafficked and profited from the domain names until uBID sought to buy them or stop them through the courts. *Toeppen*, 141 F.3d at 1322. In practical terms, this is a targeted scheme against uBID: a scheme that affects its bottom line. And

Case:09-3927 Document: 71 Filed: 08/29/2010 Pages: 31

this affects it in Illinois, where uBID is incorporated, where it pays state income and property taxes, and where it has many employees. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (noting "it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.").

The fact that uBID is incorporated in Illinois and the natural and deliberate impact GoDaddy's actions will have on uBID is in Illinois distinguishes Illinois from every other state where GoDaddy simply advertises and has customers. And GoDaddy's intentional acts directed at uBID and their effect on uBID are what allow Illinois's long-arm statute to reach GoDaddy. *See Lovelady*, 544 F.3d at 1288; *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 411-412 (7th Cir. 1994). That being said, I agree with the court that there is tension in our case law about the scope and limits of the "express aiming" test from *Calder*. Op. at 11, n.1. It has been well documented. *Nerds on Call, Inc. (Indiana) v. Nerds on Call, Inc. (California)*, 598 F. Supp.2d 913, 916-19 (S.D. Ind. 2008) (Hamilton, J.) (cited and discussed in *Tamburo*, 601 F.3d at 706). But that tension is not a reason to shy away from using *Calder* in cases like this, where the intentional acts are clearly directed at Illinois. And to the extent that "something more" is required, the court's opinion and the myriad of facts it recounts about GoDaddy's behavior in Illinois satisfies even the strictest ideas of what constitutes "something more."

Again, this is not a well-developed area of the law, and reasonable minds can disagree on what facts are

No. 09-3927                                             31

important, the way a harm should be framed, and the analysis to use. While I agree with much of the court's analysis, I write separately to emphasize that uBID is headquartered in Illinois, which is what I see as the critical link between GoDaddy's actions and finding it subject to personal jurisdiction in Illinois: given the nature of the complaint we should apply the analysis from *Calder v. Jones*.

For these reasons, I respectfully concur in the court's judgment.